UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

_____

In re:

Lightdog.com, Inc.,                                  Bky. No. 00-43556-RJK
                                                                              Chapter 7
                                Debtor.

_____

John R. Stoebner, Trustee for the Bankruptcy
Estate of Lightdog.com, Inc.,

                                Plaintiff,

v.                                                                             Adv. Pro. No.02-4204

Disney Interactive, Inc.,

                                Defendant.

_____

**SECOND AMENDED COMPLAINT**

      Plaintiff John R. Stoebner, as Chapter 7 trustee for the Bankruptcy Estate of Lightdog.com, Inc. ("Lightdog"), for his Second Amended Complaint against Defendant Disney Interactive, Inc. (herein "Disney" or "Defendant"), alleges and states as follows:

      1.     This adversary proceeding was timely commenced pursuant to Fed. R. Bankr. P. 7001 et seq. and 11 U.S.C. §§ 547(b) and 550. This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§' 157 and 1334, Fed. R. Bankr. P. 7001(1) and Local Rule 1070-1. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §157(b)(2). The petition commencing this case as an involuntary bankruptcy was filed August 9, 2000, and the Order for Relief was entered November 2, 2000; this case is now pending before this Court.

2. Plaintiff is the duly appointed, qualified, and acting Chapter 7 Bankruptcy Trustee for the Bankruptcy Estate of Lightdog.com, Inc.

3. Defendant is subject to jurisdiction in this Court in that, among other things, it has filed a proof of claim in this case; venue is proper under 28 U.S.C.§ 1409.

**General Allegations**

4. Lightdog.com was incorporated in 1999, initially under the name "A Safe Choice, Inc." Its founder was Deb Kramer, who had a background in various charitable efforts and matters relating to protection of children.

5. Kramer, as President of Lightdog.com, then known as "A Safe Choice, Inc.," developed an idea of offering a "filtered" internet service suitable for children, filtering out pornography, violence, and other unsuitable material . Kramer had prior business relationships with General Mills, Inc., and hit upon the idea of offering the filtered internet service through a promotion with General Mills by providing General Mills with CD-ROMs containing computer games and various other material of interest to purchasers of General Mills cereal products. The CD-ROMs would be included in selected General Mills cereal products, and in connection with the promotion, General Mills' customers would receive the CD-ROM containing the computer game, reference material, and a free one-month subscription to the Lightdog.com filtered internet service, with subsequent subscription fees generally to be $21.95 per month.

6. In approximately February 2000, Lightdog and General Mills entered into a Joint Promotion Agreement reflecting the concept. Under the Joint Promotion Agreement, Lightdog agreed to supply CD-ROM computer games and software to be included in cereal packages produced by General Mills.

2

7. Under the Joint Promotion Agreement, it was contemplated that Lightdog and General Mills would undertake a series of different promotions of CD-ROMs to be included in General Mills' cereals, using, among other things, products to be licensed to Lightdog by Disney Interactive ("Who Wants to be a Millionaire?"), Hasbro Interactive ("Clue"), and others.

8. General Mills stood to benefit from the promotions through increased sales of its cereal products, and, in addition, through a ten per cent share of revenues to be derived by Lightdog from subscribers to the filtered internet service to be offered in the promotional CD-ROMs.

9. The primary economic benefit to Lightdog under the Joint Promotion Agreement was to be the acquisition of subscribers to the filtered internet service expected to be acquired by Lightdog.

10. Under the Joint Promotion Agreement, all of the expense of producing the CD-ROMs was to be the obligation of Lightdog. Producing the CD-ROMs would involve Lightdog's acquisition and development of an internet domain for the filtered internet service, development of software sufficient to install and run the games and other content, as well as sign up and access to the internet service. Lightdog was required to obtain licenses for the various games from, among others, Disney Interactive ("Who Wants to be a Millionaire"), Hasbro Interactive ("Clue"), Mattell ("Lego"), and others, as well as licenses for proprietary software, such as Netsurfer's interface and Apple Computer's "QuickTime." In addition, the project involved the development and testing of "Gold Master" CD-ROMs for each version, and replication, printing, sleeving, and packaging of the CD-ROMs for delivery to General Mills.

11. According to Lightdog's financial statements, attached hereto as Exhibit A, Lightdog paid $2,364,066 relating to the creation, production, and delivery of the CD-ROMs, as follows:

| | | |
|---|---|---:|
| A. | Launching planning, website development and related expenses: | $725,000 |
| B. | Software Development and testing for Gold Masters: | $202,450 |
| C. | Sleeving | $ 25,000 |
| D. | Replication | $200,000 |
| E. | Internet Service Provider | $ 76,616 |
| F. | Content Provider payments: | |

        Disney        $ 50,000
        Hasbro        $125,000
        Merriam-Webster    $ 10,000

                                                                                                                                               $185,000

    G.    General Mills Promotion – Other                      $950,000

12  By reason of Lightdog's development, production, and delivery of the CD-ROMs, the CD-ROMs provided to General Mills enabled General Mills to increase substantially the sales of its cereal products containing the Lightdog CD-ROMs; in its advertising of the promotions, General Mills represented that each CD-ROM contained $60 worth of free software and games.

13. As a consequence of its payments to the internet service provider, the CD-ROMs Lightdog provided to General Mills did provide an opportunity for General Mills' customers to utilize a filtered internet service with the first month of service provided free of charge, at Lightdog's expense.

14. Despite its payments to the internet service provider, due to Lightdog's undercapitalization and insolvency, Lightdog was unable to acquire the internet service provider, and was unable to pay in full all vendors and suppliers necessary to implement all series of the CD-ROM promotions. Prior to the CD-ROMs appearing in the retail market with General Mills' cereals, Lightdog suffered involuntary bankruptcy proceedings, and was thereby forced out of business. As a result, Lightdog obtained no value from the subscribers to the filtered internet service offered in the General Mills promotion.

### The Disney Contract

15. Under the Joint Promotion Agreement, it was contemplated that Lightdog and General Mills would undertake a series of different promotions of CD-ROMs to be included in General Mills' cereals, using, among other things, products licensed to Lightdog by Disney, including "Who Wants to be a Millionaire?"

16. In connection therewith, on or about March 10, 2000, Lightdog and Disney entered into a "Promotion License Agreement," whereby Lightdog was authorized to utilize certain Disney Materials in the General Mills promotions; in exchange for those rights, Lightdog agreed to pay Disney $2,000,000, $1,000,000 of which was due and payable upon execution of the agreement, and the remaining $1,000,000 was "due and payable upon approval of the Lightdog Gold Master by Disney."

17. In addition, the Promotion License Agreement required Lightdog to include up to 20 megabytes of advertising promoting other Disney products and services on the CD-ROMs with the Disney content; in its development and production of the CD-ROMs containing the

Disney Content, Lightdog included all Disney advertising required by Disney.

18. Disney invoiced Lightdog for amounts due in accordance with the terms of the Promotion License Agreement; true and correct copies of the Disney invoices to Lightdog are attached hereto as Exhibit B.

19. The invoiced Disney obligations were not paid when due, but, after various demands, Lightdog paid Disney $50,000 on or about May 18, 2000. The payment made to Disney was made by wire transfer; wire transfer payments were not the ordinary practice of Lightdog.

20. Lightdog and Disney entered into an amendment to the Promotion License Agreement on or about June 15, 2000, a true and correct copy of which is attached hereto as Exhibit C.

21. Pursuant to the side agreement referenced in Exhibit C, and by agreement with Lightdog, General Mills paid Disney $1.5 million on or about June 2, 2003.

22. Prior to the payments by Lightdog and General Mills, Disney had approved Lightdog's Gold Master for the Disney content, and otherwise completed its performance under the Promotion License Agreement.

23. Approximately 6 million CD-ROMs were replicated containing the Disney Content, and all replicated copies of the CD-ROMs containing the Disney content were delivered to General Mills.

24. At no time prior to delivery of the CD-ROMs to General Mills or the payments by Lightdog and General Mills had Disney terminated or sought to terminate the Promotion License Agreement.

**Count One**
**(Preference)**

25. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 24 of his Second Amended Complaint herein.

26. During the period commencing 90 days preceding the Petition Date, Disney received transfers on account of debts owed to it by Lightdog aggregating $1,550,000 ("the Transfers").

27. At the time of each of the Transfers, Disney was a creditor of Lightdog.

28. The Transfers constituted a transfer of an interest of the Debtor in property.

29. The Transfers were for or on account of antecedent debts owed by Lightdog to Disney at the time the Transfers were made.

30. The Transfers were made for the benefit of Disney.

31. Lightdog was insolvent at the time of the Transfers.

32. The Transfers enabled Disney to recover more than it would receive as a creditor if (a) the Debtor's bankruptcy case were a case under chapter 7 of Title 11 of the United States Code, (b) the Transfers had not been made, and (c) Disney received payment of its debt to the extent provided by the provisions of Title 11 of the United States Code.

33. Pursuant to 11 U.S.C. § 547(b), the Transfers are avoidable.

34. Pursuant to 11 U.S.C. § 550(a), the Trustee may recover from Disney the avoided Transfers or the value thereof.

**COUNT TWO**
**(Claim objection)**

35. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 34 of his Amended Complaint herein.

36. Disney has filed proofs of claim, Claim Nos. 1 and 6, in the stated amount of $450,000, representing the remaining balance owed by Lightdog under the Promotion License Agreement..

37. Pursuant to 11 U.S.C. § 502 (d), Disney's claims must be disallowed until and unless Defendant has paid over to the estate the amount of the avoidable Transfers.

WHEREFORE, Plaintiff prays for Judgment against Defendant Disney Interactive, Inc., as follows:

1. On Count One, for judgment avoiding the Transfers and awarding to the bankruptcy estate recovery of $1,550,000.00, or such other amount as may be determined by the Court, together with interest thereon;

2. On Count Two, for disallowance of Defendant's claims until and unless Defendant shall have paid over to the estate the amount of avoidable Transfers;

3. For recovery of Plaintiff's costs and disbursements herein; and,

4. For such other and further relief as may be equitable and just.

May 15, 2003.　　　　　　　　　　　　KALINA, WILLS, GISVOLD & CLARK, P.L.L.P.
　　　　　　　　　　　　　　　　　　　By:　/e/ Gordon B. Conn, Jr.
　　　　　　　　　　　　　　　　　　　　　　Gordon B. Conn, Jr. (#18375)
　　　　　　　　　　　　　　　　　　　6160 Summit Drive, Suite 560
　　　　　　　　　　　　　　　　　　　Minneapolis, MN 55430
　　　　　　　　　　　　　　　　　　　Tel. (612) 789-9000
　　　　　　　　　　　　　　　　　　　Fax (763) 503-7070
　　　　　　　　　　　　　　　　　　　Attorneys for Plaintiff
　　　　　　　　　　　　　　　　　　　John R. Stoebner, Trustee