# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MINNESOTA

---

In re:

Lightdog.com, Inc.,  Bky. No. 00-43556-RJK
           Debtor.  Chapter 7

---

John R. Stoebner, Trustee for the Bankruptcy
Estate of Lightdog.com, Inc.,

           Plaintiff,

v.  Adv. Pro. No.02-4204

Disney Interactive, Inc.,

           Defendant.

---

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUSTMENT

Plaintiff John R. Stoebner, as Chapter 7 Trustee for the bankruptcy estate of Lightdog.com, Inc., submits this memorandum in opposition to the motion for summary judgment filed by Defendant Disney Interactive, Inc. ("Disney"). Accompanying this memorandum are affidavits of John R. Stoebner, Trustee, and Gordon B. Conn, Jr., counsel for the Trustee in this matter. The facts in this matter, to the extent currently known, are largely not in serious dispute, but the legal consequences of the facts are very much in dispute, and the Trustee submits that, based upon factual material contained in the accompanying affidavits and in Disney's motion, and upon the discussion of law in this memorandum, the motion for summary judgment must be denied.

1

**Background**

The Debtor, Lightdog.com, Inc. ("Lightdog"), in February 2000 entered into a "Joint Promotion Agreement" with General Mills whereby Lightdog was to furnish to General Mills several million CD-ROMs for inclusion in boxes of General Mills' cereals (Stoebner Aff., Ex. L). The CD-ROMs were to contain various computer games, to be licensed to Lightdog by Disney, Hasbro, and others, and would also contain various reference materials, e.g., the Merriam-Webster dictionary, as well as an offer of up to 250 hours free internet access to a filtered internet service to be provided by Lightdog.

Lightdog hoped to make money from the promotion by acquiring subscribers to its filtered internet service who, after the first free month, would pay $21.95 per month for the internet service. General Mills was to receive a ten per cent share of such revenues.

Virtually all of the cost (other than transportation) of providing the CD-ROMs to General Mills was to have been borne by Lightdog. Costs involved included not only the costs of the physical production of the CD-ROMs, but also all of the development costs, including setting up and paying for the internet service provider, developing software, producing the "gold master" CD-ROMs for testing and approval, and obtaining licenses for use of proprietary software and games to be provided to Lightdog by Disney Interactive, Hasbro Interactive, Merriam-Webster, and others. Copies of various Lightdog business records reflecting contracts for such matters are attached to the Stoebner Affidavit as Exhibits E, F, I, and J.

In addition to those development costs, Lightdog was to foot the bill for the physical production of the CD-ROMs, including replication, printing, and sleeving into "CD-Romvelopes" suitable for inclusion in packages for the General Mills cereal products.

Lightdog had entered into a letter of intent to acquire an internet service provider, Hometown Internet Service, for a consideration of $4 million (Stoebner Aff. Ex. C). Lightdog lacked the capital to conclude the acquisition, but paid the internet service provider for development of its website and the filtered internet service to be offered in the General Mills promotion, and apparently authorized Hometown to use its website and receive subscription payments from subscribers to the Lightdog service to be offered in the General Mills promotion. It appears that Lightdog paid at least $100,000 to Hometown Internet for this purpose (Stoebner Aff., ¶ 7, Ex. D).

Under the letter of intent, Hometown was authorized to use the Lightdog name and website, and also to receive subscription fees from subscribers to the Lightdog internet service in the General Mills promotion until such time as the acquisition of Hometown by Lightdog might be completed.

Lightdog's out-of-pocket investment in developing the CD-ROMs and internet service appears to have exceeded $2 million (Stoebner Aff., Ex A), and Lightdog appears to have incurred substantial additional obligations in preparing materials for the General Mills promotion (Involuntary Petition; claims register, Stoebner Aff. Ex. K, B). Lightdog then essentially ran out of money; although it had entered into agreements with Disney, Hasbro, and Merriam-Webster to use their games and reference materials in the CD-ROMs (Stoebner Aff, ¶¶ 10, 11, 12), Lightdog fell behind on its payment obligations.

It also fell behind on the schedule for production of the final products for delivery to General Mills, and General Mills undertook to pay directly various vendors, but with Lightdog still obligated to pay General Mills for its whatever it chose to pay to the Lightdog vendors (Jenos Declaration, ¶ 12; Conn Aff. Ex. C).

3

General Mills paid those suppliers--and <u>only</u> those suppliers--it deemed necessary to obtain delivery of the CD-ROMs, including the replicator (Hotan), the printer and sleever, and Disney and Hasbro. It appears that General Mills received approximately 18 million CD-ROMs for its promotion . Although development of the CD-ROMs for the General Mills promotion involved numerous other vendors to Lightdog, many of whom had not been fully paid by Lightdog, General Mills did not pay such other creditors, and certain of those vendors filed a petition for involuntary bankruptcy against Lightdog on August 9, 2000, shortly after the time the promotion was begun by General Mills. An order for relief was entered November 2, 2000, and Plaintiff John R. Stoebner was appointed Chapter 7 trustee, in a no-asset case.

As Lightdog's financial ability to perform was disappearing, General Mills became concerned over delays in Lightdog's delivery of the product to General Mills. On or about May 4, 2000, General Mills issued its purchase orders to the replicator, Hotan, to replicate and deliver the CD-ROMs for sleeving and ultimate delivery to General Mills; copies of the purchase orders to Hotan are attached to the Jenos Declaration (Conn Aff. Ex. C) as Exhibit E. It appears that the CD-ROMs were then replicated and delivered to General Mills over the following several weeks.

Included in the CD-ROMs to be replicated and delivered were those containing Disney's "Who Wants to be a Millionaire" game. By a Promotion License Agreement entered into between Lightdog and Disney on March 10, 2000 (Stoebner Aff., Ex. J), Lightdog was authorized to include Disney's game in certain of the CD-ROMs to be supplied to General Mills. In exchange for those rights, Lightdog agreed to pay Disney $2 million, $ 1 million of which was due and payable upon execution of the agreement, and the remaining $ 1 million was "due and payable upon approval of the Lightdog Gold Master by Disney."

In addition to requiring Lightdog to pay the $2 million, Lightdog was also required to

4

include in the CD-ROMs containing the Millionaire game certain "other Disney Content," presumably material advertising and promoting other Disney products. A copy of the package containing the "Millionaire" CD-ROM is attached to the Stoebner Affidavit as Exhibit M; the packaging represented that it contained **"Over $50 of VALUE includes Game, Merriam-Webster Dictionary and Internet Access Offer."**

## Procedural Background

This adversary proceeding was commenced by the Trustee on November 1, 2002, seeking to avoid as a preference and recover the $50,000 paid by Lightdog by wire transfer to Disney on May 18, 2000. Prior to Disney's answer, it was discovered that Disney had received the additional $1.5 million payment from General Mills. Plaintiff then served and filed an Amended Complaint seeking avoidance and recovery of the entire $1,550,000. At the request of Disney's counsel for a more definite statement, Plaintiff served and filed a Second Amended Complaint containing more detailed factual allegations.

Disney served Plaintiff with detailed interrogatories and requests for production of documents, to which Plaintiff served his responses on July 25, 2003 (Conn Aff., Ex. B). The Trustee served written interrogatories on Disney on August 12, 2003 (Conn Aff., Ex. A), which have not yet been answered

## ARGUMENT

I. **Lightdog's payment of $50,000 to Disney on May 18, 2000, operated as an avoidable preferential transfer to Disney.**

Lightdog's wire transfer of $50,000 to Disney on May 18, 2000, is clearly subject to

avoidance as a preference; necessary elements for avoidance of that transfer as a preference are readily established:

1. Lightdog was insolvent (Stoebner Aff., Ex. A), a presumption not challenged by Disney.

2. Disney was a creditor of Lightdog, by reason of Lightdog's failure to have paid the $ 2 million required under the Promotion License Agreement.

3. The payment, made directly by Lightdog, was a transfer of property of the Debtor.

4. The payment enabled Disney to receive more than it would have in a Chapter 7 distribution, with the meaning of 11 U.S.C. §547 (b) (5); this is a no-asset case, with substantial claims against the bankruptcy estate.

**II.  Disney's receipt of $ 1.5 Million from General Mills likewise operated as an avoidable preferential transfer to Disney.**

The central issue presented by Disney's motion for summary judgment is whether its receipt of $1.5 million from General Mills on or about June 2, 2000, may be avoided as a preferential transfer. In support of its position, Disney relies on case law for the proposition that, generally speaking, a third party's payment of a debtor's obligation is not a preferential transfer to the recipient.

As a general rule, that observation is obviously correct, because where the payment is made by a guarantor, there has been no transfer of "an interest of the debtor in property" for purposes of 11 U.S.C § 547 (b). In most circumstances involving third-party payments to a creditor (as by a guarantor or surety), the preferred creditor faces no liability because the third party is merely substituted as a creditor, and there has been no transfer of an interest of the

debtor in property. Brown v. First National Bank of Little Rock, Arkansas, 748 F. 2d 490 (8th Cir. 1984).

But where the third party receives a transfer from the debtor on account of which it pays a creditor of the debtor, the situation is quite different. As recognized in Brown:

> "The result might be different were there any evidence that the individual co-makers received money or property from Ark-La in exchange for paying of the note. Such indirect transfers from the debtor's estate may be avoided since they result in diminution of the bankrupt's estate. *** The transfers by the co-makers were made in order to extinguish their personal liability on the note and there is nothing to show that they received anything from Ark-La in return."

748 F. 2d at 491.

It has long been recognized that such indirect transfers may be avoidable in bankruptcy as indirect preferences:

> "To constitute a preference, it is not necessary that the transfer be made directly to the creditor. It may be made to another, for his benefit. If the bankrupt has made a transfer of his property, the effect of which is to enable one of his creditors to obtain a greater percentage of his debt than another creditor of the same class, circuity of arrangement will not avail to save it."

National Bank of Newport v. National Herkimer County Bank, 225 U.S. 178 (1912). See also Dean v. Davis, 242 U.S. 438, 443 (1917) (" Mere circuity of arrangement will not save a transfer which effects a preference from being invalid as such").

Case law under the 1978 Bankruptcy Code has continued to look through "circuity of arrangements" for purposes of avoiding preferences. For example, where a debtor transfers its assets to a third party who then pays a creditor of the debtor, the creditor may be liable for receiving a preferential transfer, Warsco v. Preferred Technical Group, 258 F. 3d 557 (7th Cir. 2001); Buckley v. Jeld-Wen, Inc. (In re Interior Wood Products Company), 986 F. 2d 228 (8th Cir. 1993); In re Food Catering & Housing, Inc., 971 f. 2d 396 (9th Cir. 1992); Covey v. Davlin,

7

2001 W.L. 34076375 (Bankr., C. D. Ill. 2001).

Likewise, where a customer of the debtor makes payments directly to the debtor's supplier in order to obtain delivery of widgets from the debtor, the payment to the supplier may be avoidable as a preferential transfer, <u>In re Phelps Technologies, Inc</u>., 245 B. R. 858 (Bankr. W. D. Mo. 2000). Even where the third party, not the debtor, decides which creditor to pay, the favored creditor may face preference exposure, <u>In re S.E.L. Maduro (Florida), Inc</u>., 205 B. R. 987, 992 (Bankr. S. D. Fla. 1997). Indeed, a creditor may face preference exposure for benefit received even where there was no direct transfer to it by either the debtor or the third party: <u>In re Prescott</u>, 805 F. 2d. 719, 731 (7th Cir. 1986) (Debtor's payment of senior secured creditor is a preferential transfer to a junior undersecured creditor by reason of increasing the value of its lien). The factual situation here presented is thus analogous to that in <u>Warsco</u>, <u>Interior Wood</u>, and <u>Food Catering</u>, where a creditor paid by a transferee of the Debtor's assets was held to have received a voidable preference, and to that in <u>Phelps</u>, in which a transferee of goods of the Debtor paid the Debtor's vendor directly.

The critical inquiry is whether there has been a transfer of an <u>interest</u> of the debtor in property to or <u>for the benefit</u> of a creditor. Disney asserts (Brief, p.6) that "to satisfy the statutory requisites for a preferential transfer, a trustee must demonstrate, preliminarily, that the transferred property <u>belonged to Lightdog</u>" (emphasis in original). Disney argues that a) because Disney retained ownership of the Disney Content (Brief, p. 3), and b) because the $1.5 million paid to Disney was General Mills' money, not Lightdog's (Brief, p.7), there was no transfer to Disney of property of the estate. That argument fails, for several reasons.

First, it ignores the language of the statute which permits avoidance of transfers of an <u>interest</u> of the debtor in property; it is not necessary that the transfer be of property owned by the

8

debtor, but only that it be a transfer of property in which the Debtor had an interest.

Lightdog clearly had an interest in the property it transferred to General Mills. Although it did not "own" the Disney Content, it certainly had an "interest" in it: the Promotion License Agreement specifically authorized Lighdog to utilize the Disney content in the General Mills promotion. Moreover, Lightdog otherwise had an interest in the CD-ROMs supplied to General Mills; it had incurred the expense of development, and the CD-ROMs also contained Lightdog's proprietary material, including software and the internet access offer, as was expressly recognized in Lightdog's Joint Promotion Agreement with General Mills (Stoebner Aff. Ex. L). In the trustee's adversary proceeding against General Mills, Adv. No. 02-4210, the trustee claimed in part that the Debtor's belated delivery of CD-ROMs to General Mills constituted a preferential transfer of the CD-ROMs respecting an antecedent debt (claim) owed to General Mills. General Mills sought summary judgment, arguing that because it had paid for most of the replication costs, it owned the CD-ROMs, such that its receipt thereof was not a transfer of an interest of the debtor in property. This Court denied that portion of General Mills' motion for summary judgment, observing that the arrangements had characteristics of a sale to General Mills, with ownership not passing until receipt of the material by General Mills. See General Mills' purchase order's terms and conditions, Stoebner Aff. Ex. L.

Second, the argument that the money paid to Disney was General Mills' and not Lightdog's is overly simplistic. Of course, any time a third party makes a direct payment to a creditor of the debtor, the money paid belonged to the third party, not the debtor, but the critical inquiry is whether the payment was made by reason of a transfer of an interest in property from the debtor to the third party. Under the Bankruptcy Code, the definition of "transfer" is expansive, 11 U.S.C. § 101(54), and the June 2, 2000, payment to Disney was made by reason of

9

Lightdog's transfer of its property to General Mills; obviously, if Lightdog had not transferred its interest in property (the CD-ROMs) to General Mills, General Mills would not have paid part of Lightdog's antecedent debt to Disney.

In the case at hand, as in <u>Phelps</u>, the Debtor did transfer property to the third party, namely the CD-ROMs containing the Disney computer game and other Disney content. Lightdog had made substantial investments and incurred substantial expense and liabilities in preparing the CD-ROMs for delivery to General Mills. Unlike the situation in <u>Brown</u>, General Mills was not a guarantor or otherwise liable for Lightdog's debts to its vendors; General Mills attempted to make that very clear in its Joint Promotion Agreement with Lightdog. General Mills subsequently paid Disney for one reason and one reason only: to assure its ability to use without interference the Lightdog-supplied CD-ROMs containing the Disney game and other Disney Content. But for General Mills' receipt of Lightdog's interest in property—the CD-ROMs--the payment would not have been made; the element of a transfer of an interest of debtor in property is thus present in this situation.

In light of the requisite transfer by Lightdog of an interest in property, it is clear that all elements of Section 547 (b) are here present:

1. Lightdog was insolvent (Stoebner Aff., Ex. A), a presumption not challenged by Disney.

2. The debt was antecedent; Lightdog became obligated in March to pay $ 2 million to Disney, and was in default.

3. The transfers of the CD-ROMs within the preference period were for the benefit of a creditor, Disney, not only to provide the basis for General Mills' direct payment to Disney, but also to provide performance of Lightdog's other obligation under the

Promotion License Agreement to include the "other Disney Content," i.e., advertising, on approximately 6.6 million CD-ROMs to be distributed with the General Mills' cereal products.

4. The transfers of the CD-ROMs enabled Disney to obtain more than it would have in a Chapter 7 bankruptcy had the transfers not occurred for purposes of 11 U.S.C. §547 (b) (5).

Of course, there may be an issue of the value of the debtor's interest in property transferred for the benefit of a creditor, Disney. Some case law involving creditor preference liability for payments from third parties suggests that the preference exposure may be limited to the value of the interest in property the debtor transferred on account which the third party paid the creditor. See, e.g., DeRosa v. Buildex Incorporated, 53 B.R. 842, 846 (Bankr. E.D.N.Y. 1985) (collecting cases); contra: Derryberry v. The Peoples Banking Company, 55 B.R. 770, 775 (Bankr. N.D. Ohio 1985) ("requiring the trustee to prove the value of the transferred property is an erroneous procedure under the Code").

Disney is obviously aware of this issue, and requested such valuation information in discovery. As set forth in Plaintiff's Answers to Interrogatories (Conn Aff. Ex. B) in this proceeding, various measures of value may be found applicable at trial, including Lightdog's investment in developing the CD-ROMs (over $2 million), or the value of what was provided to General Mills' customers respecting the Disney CD-ROMs, $50 of value for each of 6.6 million CD-ROMs, $330 million. The most conservative measure of value, of course, is what General Mills was willing to pay Disney: $1.5 million. Cf. Derryberry v. The Peoples Banking Company, supra at 775 (third party took security interest from debtor and paid bank $500,000 on

overdraft debt; court rejected as a matter of law bank's claim that the actual value of security transferred by debtor was less than amount paid to bank and held bank liable for full amount of payment received from third party).

**III.     The Earmarking Doctrine is not applicable.**

Disney next argues that its receipt of the $1.5 million is not subject to preference liability because it was "earmarked" for Disney. But the "earmarking" doctrine is really just a variant on the question of whether there was a transfer of an interest of the debtor in property, and the argument fails for the same reasons. "Earmarking" involves situations in which one creditor is substituted for another, such that the payment by the new creditor to the old has not involved any transfer of interest in property by the debtor; if the new creditor receives a transfer from the debtor, such as a security interest, the preferred creditor receiving the otherwise preferential payment is not protected by the earmarking doctrine. See In re Libby International, Inc., 247 B.R. 463, 466 (BAP 8th Cir. 2000); In re Heitkamp, 137 F. 3d 1087 (8th Cir. 1998). The replacement debt must be of the same character as the debt paid; if the old debt or a portion thereof was unsecured, and the new debt is secured, the estate's property available to unsecured creditors is diminished, and earmarking will not apply. See In re Superior Stamp & Coin Co., 223 F. 3d 1004 (9th Cir. 2000).

In the present case, General Mills paid Disney, an unsecured creditor, only after receipt of transfers of interests in property from Lightdog; in these circumstances, earmarking has no applicability.

**IV.     Disney's Ordinary Course and New Value defenses are without merit.**

Disney also contends that the payments it received are protected by the "ordinary course"

12

and "new value" defenses.  These are affirmative defenses, and the Defendant has established neither.

The payments cannot be deemed to have been made in the ordinary course of the business or financial affairs of the debtor and the transferee, first, because there was no prior relationship between Lightdog and Disney from which to gauge what was their ordinary course of dealings; see <u>In re Nation-Wide Exchange Services, Inc.</u>, 2003 WL 1718153 at *14 (Bankr. D. Minn. 2003); <u>In re Hancock-Nelson Mercantile Co., Inc.</u>, 122 B.R. 1006, 1011 (Bankr. D. Minn. 1991); <u>In re Schick,</u> 234 B.R. 337, 347 (Bankr. S. D. N. Y. 1999) (creditor must establish a "baseline of dealings" to enable the court to compare the payment practices during the preference period with the prior course of dealing).

Apart from the lack of any such baseline of dealings between Lightdog and Disney, a wire transfer made only after Disney's May 3, 2000, notice of default and threat to terminate (Drews Declaration, ¶ 11) can hardly be viewed as having been made in the parties' ordinary course of business.  Similarly, the payment by General Mills of $ 1.5 million after receipt of the CD-ROMs is, if anything, <u>extraordinary</u>;  Disney cannot establish an ordinary-course defense.

Nor has Disney established a new-value defense.  The amendment to the promotion license agreement expressly recited that it was an agreement to forbear from its remedies (Disney Exhibit 4).  It is recognized in this Circuit that "forbearance is usually not new value," <u>In re Jones Truck Lines, Inc.</u>, 130 f. 3d 323, 326 (8th Cir. 1997).  <u>See</u> <u>also</u> <u>In re Air Conditioning, Inc.</u>, 845 f. 2d 293 (11th Cir.1988), cert. denied 488 U.S. 993.  Forbearance from revoking a non-exclusive license, as Disney had threatened to do, is likewise not new value, <u>In re Superior Toy & Manufacturing Co.</u>, 183 B.R. 826, 835 (Bankr. N.D. Ill. 1995) ("the ability to revoke a non-

13

exclusive license, similar to the right to forbear, does not fall into the definition of new value").

Disney's forbearance gave the Debtor no new credit, services, or property; nor did General Mills' payment to Disney provide new value to the Debtor, for Lightdog remained fully liable for the amounts paid by General Mills; in such circumstances, there is no "new value" to the Debtor, In re Nationwide Exchange Services, Inc., supra, 2003 W.L. 1718153 at *13.

## CONCLUSION

Despite the favor toward the summary judgment tool reflected in the Supreme Court trilogy cited byDisney, Rule 56 continues to require that to grant summary judgment a court must find that there are no material facts in issue, and that the moving party is entitled to judgment as a matter of law.

For the reasons set forth above, and on the accompanying affidavits and exhibits, Defendant's motion for summary judgment must be denied.

September 5, 2003	KALINA, WILLS, GISVOLD & CLARK, P.L.L.P.

By: /e/ Gordon B. Conn, Jr.
    Gordon B. Conn, Jr. (#18375)
6160 Summit Drive, Suite 560
Minneapolis, MN 55430
Tel. (612) 789-9000
Fax (763) 503-7070
Attorneys for Plaintiff
John R. Stoebner, Trustee

UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF MINNESOTA

_____

In re:

Lightdog.com, Inc.,                              Bky. No. 00-43556-RJK
                                                        Chapter 7
                    Debtor.
_____

John R. Stoebner, Trustee for the Bankruptcy
Estate of Lightdog.com, Inc.,

                    Plaintiff,

v.                                               Adv. Pro. No.02-4204

Disney Interactive, Inc.,

                    Defendant.
_____

                         UNWORN DECLARATION OF SERVICE


       Gordon B. Conn, Jr., under penalty of perjury, declares that on the 5th day of September, 2003, he served by facsimile and by United States mail the Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, together with Affidavits of John R. Stoebner and Gordon B. Conn, Jr., upon:

              Mark J. Kalla
              Dorsey & Whitney LLP
              50 South Sixth Street
              Suite 1500
              Minneapolis, MN 55402-1498

Dated: September 5, 2003

                                       /e/ Gordon B. Conn, Jr.
                                       Gordon B. Conn, Jr.
                                       6160 Summit Drive, #560
                                       Minneapolis, MN 55430
                                       (612) 789-9000